United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.G., et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al.,<br><br>　　　　　Defendants. | Case No. 17-cv-05678-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL MEDICAL EXAMINATION**<br><br>Docket No. 119 |

Plaintiff S.G., a minor student, alleges that Defendant Donavan Eagle Harper, a teacher at Defendant San Francisco Unified School District ("the District"), sexually abused her and that the District failed to take timely action to intervene and to remedy the effects of the harassment on Plaintiff. Plaintiff alleges that Harper's abuse has caused her severe emotional and psychological distress. Docket No. 40 (First Amended Complaint or "FAC") ¶ 38. She now suffers from moderate to severe anxiety, depression, and posttraumatic stress disorder, has become socially isolated, and meets regularly with a therapist. *Id.* ¶¶ 48–50. One of the claims she asserts against Defendants is intentional infliction of emotional distress. *Id.* ¶¶ 99–107.

The parties are now engaged in discovery. During a May 30, 2019 case management conference, the parties notified the Court of a possible dispute regarding examination requests. The Court set a briefing schedule in the event the parties were unable to resolve the dispute. *See* Docket No. 117. The District has now moved to compel Plaintiff's attendance at a medical examination pursuant to Federal Rule of Civil Procedure 35. Docket No. 119 ("Mot."). After the hearing on the motion on August 8, 2019, the Court directed Dr. Hall to "submit a declaration in support of each of the four proposed tests, explaining the importance/relevance of each." Minute

Order from Hearing on August 8, 2019 ("Min. Order"); Docket No. 131. The parties were ordered to meet and confer "to determine whether they c[ould] agree upon which test(s) will be administered and the timing/conditions of any such testing." *Id.* Should an agreement not be reached, the Court permitted Plaintiff "to file a short response as to why (or which of) the four tests identified by Defendant are not warranted." *Id.* An agreement was not reached by the parties, and declarations of Dr. Hall and Dr. Cecchet have been filed. *See* Docket Nos. 134, 136. The Court now rules on Defendants' Motion to Compel Plaintiff's Attendance at Medical Examination.

## I. BACKGROUND

At bottom, the parties' dispute is over the scope of the examination. Plaintiff has "undergone a psychological evaluation and testing by her own expert, Dr. Stacy Cecchet, who provided a serious psychological diagnosis relying heavily on her own interpretations of the test results." Mot. at 3. Plaintiff describes this testing as "a comprehensive, 5-hour psychological evaluation of Plaintiff," in which "Dr. Cecchet performed a variety of tests, including the Behavior Assessment System for Children – Second Edition (BASC), Multidimensional Anxiety Scale for Children – Second Edition (MASC-2), Child Depression Inventory – Second Edition (CDI-2), and the Traumatic Events Screening Inventory (TESI-C)." Opposition to Defendants' Motion to Compel Medical Exam ("Opp.") at 3; Docket No. 123; *see also id.* at 6. ("Dr. Cecchet has completed only a straight-forward, five-hour forensic psychological evaluation including basic psychological testing.")

The District is now seeking to subject Plaintiff to a psychiatric examination by Dr. Anlee Kuo and a psychological evaluation by Dr. Sarah Hall. *See* Mot. at 6; Docket No. 126 ("Reply") at 2. The District characterizes the psychiatric and psychological evaluations as two components of "a single Independent Medical Exam" ("IME"). Mot. at 7. Plaintiff "consent[s] to a psychiatric examination by Dr. Kuo," Opp. at 2–3, and objects only to the additional psychological assessment to be conducted by Dr. Hall, *see* Declaration of Dr. Cecchet in Opposition to Proposed Tests to Be Administered to Plaintiff ("Supp. Cecchet Dec.") at 3–4; Docket No. 136.

A. <u>Dispute as to Neuropsychological Testing</u>

Initially, the parties appeared to disagree about whether Plaintiff was to submit to neuropsychological testing, in addition to the psychiatric evaluation that was to be conducted by Dr. Kuo. *See* Opp. at 2, 3. Plaintiff observed that "[t]he focus of a neuropsychological evaluation includes cognitive and motor function, memory, perception, and problem-solving," but that Plaintiff is not making any claims related to neurological functioning deficits." Opp. at 2 (internal citations omitted). As a result, Plaintiff denied that such testing was relevant and argued that Defendants had "failed to establish that 'good cause' exists or that Plaintiff has placed her neuropsychological condition 'in controversy.'" Opp. at 2, 4. Plaintiff also added that "Plaintiff has not submitted to any neuropsychological testing, nor has Plaintiff retained any neuropsychologist experts." Opp. at 6; *see also id.* at 2 ("Plaintiff's own expert, Dr. Stacy Cecchet PhD ABPP, did not complete any neuropsychological testing."). Defendants responded that they do not "seek neuropsychological testing of Plaintiff, only psychological testing. The DISTRICT and its retained experts agree that neuropsychological testing is not required given Plaintiff's current alleged injuries and diagnosis." Reply at 2. Given the resolution of this earlier disagreement, the Court will not address the issue of neuropsychological testing.

B. <u>The Need for Psychiatric and Psychological Testing</u>

As noted above, the parties have agreed to a psychiatric examination to be conducted by Dr. Kuo. *See* Opp. at 2, 3. The scope of Dr. Kuo's proposed examination is notable. Defendants describe it as follows: Dr. Kuo will "review all medical and legal records both prior and subsequent to the events giving rise to the relevant legal matters," conduct "an in-depth interview of Plaintiff . . . including both Plaintiff's own account of the event which she claims was the cause of her alleged current emotional injuries, along with a brief mental status examination of current mood, speech, and mental functioning at the time of the interview," and engage in "a detailed inquiry into Plaintiff's functioning prior to the index event . . . including a thorough personal history that includes family and trauma histories, social and environmental factors, school history, legal history, as well as medical and psychiatric histories." Mot. at 6.

In addition to the agreed-upon psychiatric evaluation, Defendants seek to compel Plaintiff

3

to attend a second day of testing that would entail a psychological examination, at which Dr. Hall would "administer, score, and interpret psychological test data." *Id.* at 6, 7. Defendants emphasize that Dr. Hall will "only be administering test questions," *id.* at 7 (see further discussion of the tests below), in order to assess "the validity of Plaintiff's diagnosis and symptoms," *id.* at 3; *see also id.* (describing the psychological testing as "necessary to evaluate the scope, severity, and existence of Plaintiff's alleged injuries."). Furthermore, Plaintiff will not be required—as part of the psychological testing—to "relive her trauma or discuss her alleged victimization. She will not be discussing the underlying events at issue." *Id.* at 3 (internal citations omitted); *see also id.* at 7. Defendants describe the two days of testing as providing "complimentary and non-overlapping analyses of Plaintiff." *Id.* at 7. Defendants further contend that "[a] Psychiatric Examination and Psychological Testing are [both] necessary to assess the validity of [Plaintiff's] alleged disorders and extent of her damage allegations. Utilization of psychological testing results along with information obtained from a psychiatric interview is the most objective approach to arriving at a reliable and valid conclusion regarding diagnoses, functional impairment, and subjective distress of an individual." Mot. at 6.

Plaintiff responds that this request exceeds the bounds of what is necessary, and further could harm Plaintiff by exacerbating her symptoms of trauma. *See* Opp. at 3 ("Plaintiff's detailed descriptions of the abusive incidents were necessary to Dr. Cecchet's evaluation, but additional exhaustive testing has been known to cause exacerbation of trauma symptoms, including nightmares, emotional outbursts, aggression, tearfulness, and self-harm behavior."). More specifically, Plaintiff contends that the "agreed-upon psychiatric evaluation as described by Dr. Kuo in her declaration would have been reasonably equivalent to the evaluation [Plaintiff] underwent with her own expert, Dr. Stacy Cecchet." *Id.* at 6. As a result, Plaintiff objects to the administration of psychological testing by Dr. Hall.

C. <u>The Scope of Psychological Testing to Be Permitted</u>

The parties also disagree about the scope of the psychological testing to be conducted should the Court compel Plaintiff to attend the psychological testing in addition to the agreed-upon psychiatric examination. The District proposes that Dr. Hall will "administer the following

4

tests to complement Dr. Kuo's examination and to evaluate Plaintiff's psychological status":

- Memory Validity Profile (MVP)
- Minnesota Multiphasic Personality Inventory-Adolescent (MMPI-A)
- Personality Assessment Inventory-Adolescent Version (PAI-A)
- Rorschach Performance Assessment System (R-PAS)

Reply at 2. Dr. Hall explains that this test battery "constitute[s] the group of tests that [Dr. Hall] routinely administer[s] as part of [her] standard practice in all forensic personal injury cases involving minor plaintiffs." Supp. Hall Dec. at 2. However, Dr. Hall also explains that "this battery may be altered to some extent if, in [Dr. Hall's] clinical opinion, other tests are necessary in order to more fully investigate [Plaintiff's] current emotional and psychological functioning." *Id.* She also notes that "[i]t is difficult to be precise about the time required for the battery of tests since each examinee is different and the majority of the tests themselves are untimed." *Id.*

## II. <u>DISCUSSION</u>

A. <u>Legal Standard</u>

Federal Rule of Civil Procedure 35 provides that a court "may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination" upon a showing of "good cause." Fed. R. Civ. P. 35(a). These requirements "are not met by mere conclusory allegations of the pleadings – nor by mere relevance to the case – but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). "Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements." *Id.*

"A mental condition is 'in controversy' when it is itself the subject of the litigation." *Gavin v. Hilton Worldwide, Inc.*, 291 F.R.D. 161, 164 (N.D. Cal. 2013). This means that one or more of the following factors is present: (1) the complaint includes a claim for intentional or negligent infliction of emotional distress; (2) the plaintiff alleges a specific mental or

5

psychiatric injury or disorder; (3) the plaintiff claims unusually severe emotional distress; (4) the plaintiff offers expert testimony to support the claim of emotional distress; or (5) the plaintiff concedes that her mental condition is "in controversy" for purposes of Rule 35. *Id.*

"To establish 'good cause' exists for [a Rule 35 examination], the moving party generally must offer specific facts justifying the discovery." *Id.* at 165. "Relevant factors courts consider include the possibility of obtaining desired information by other means, whether plaintiff plans to prove her claim through testimony of expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." *Id.* (citation and quotation marks omitted).

B.  Analysis

Plaintiff agrees that her mental condition is generally "in controversy" in this case and that good cause exists for her to undergo a psychiatric examination.[1] Opp. at 2. As noted above, the parties have agreed to a psychiatric examination to be conducted by Dr. Kuo. *See* Opp. at 2, 3. The only point of contention is whether Plaintiff should be ordered the attend the second examination to be administered by Dr. Hall, and if so, what the scope of that examination shall be. Rule 35 "requires an affirmative showing by the moving party that the plaintiff's condition is genuinely in controversy and that good cause exists for ordering the *specific examination* being requested." *Boadi v. Ctr. for Human Dev., Inc.*, No. 3:14-CV-30162-KAR, 2017 WL 2369372, at *2 (D. Mass. May 31, 2017) (emphasis added) (citing *Schlagenhauf*, 379 U.S. at 119, 121). Hence, Defendants must make "an affirmative showing" that the specific examination by Dr. Hall "is really and genuinely in controversy and that good cause exists for ordering [it]." *Schlagenhauf*, 379 U.S. at 118. As Defendants acknowledge, "'[g]ood cause' for a mental examination requires a showing that the examination could adduce specific facts relevant to the cause of action and necessary to the defendant's case." *Lester v. Mineta*, No. C 04-03074 SI, 2006 WL 3741949, at *1 (N.D. Cal. Dec. 19, 2006) (quoting *Ragge v. MCA/Universal Studios*, 165

---

[1] Plaintiff has (1) asserted a claim for intentional infliction of emotion distress; (2) alleged a specific mental or psychiatric injury (PTSD, *see* Docket No. 120, Exh. A at 2); (3) claims unusually severe emotional distress (*see* FAC ¶¶ 38, 76, 103); and (4) has offered expert testimony from psychologist Dr. Cecchet to support her claims of emotional distress (*see* Docket No. 125).

6

1  F.R.D. 605, 609 (C.D.Cal.1995)); *see* Mot. at 6.

## C. The Need for Psychological Testing

Based on the parties' arguments, it appears that psychological testing could "adduce specific facts relevant to the cause of action and necessary to the defendant's case." *Lester*, 2006 WL 3741949, at *1. As discussed above, Dr. Kuo's agreed-upon psychiatric examination will include (1) an in-depth interview of Plaintiff in which Plaintiff discusses "the event which she claims was the cause of her alleged current emotional injuries," (2) "a brief mental status examination," (3) "a detailed inquiry into Plaintiff's functioning prior to the index event," and (4) an investigation of Plaintiff's "personal history that includes family and trauma histories" in addition to many other factors. Mot. at 6. Dr. Hall's testing, on the other hand, involves the administration and interpretation of psychological testing. *Id.* at 6, 7. The purpose of such testing is to assess "the validity of Plaintiff's diagnosis and symptoms," *id.* at 3; *see also id.* (describing the psychological testing as "necessary to evaluate the scope, severity, and existence of Plaintiff's alleged injuries."). Dr. Hall further explains that "the use of these tests allows for a statistical comparison of Plaintiff's functioning to other individuals of similar age and educational level, as well as to those who have experienced comparable injuries or diagnoses, and even to the examinee's own functioning at different points in time. The analysis of these test results provides scientific evidence that can inform evidence-based opinions regarding Plaintiff's claims of emotional distress." Declaration of Dr. Hall in Support of District's Request to Compel Examination ("Hall Dec.") at 2; Docket No. 126-1.

As noted above, factors in the Rule 35 "good cause" inquiry "include the possibility of obtaining desired information by other means, whether plaintiff plans to prove her claim through testimony of expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." *Gavin*, 291 F.R.D. at 165. The information Dr. Hall describes is clearly relevant to Plaintiff's cause of action for intentional infliction of emotional distress, especially since Plaintiff is claiming ongoing emotional distress. Moreover, Dr Hall explains that it "simply is not within the scope" of a psychiatrist's training to administer the psychological tests she describes, Hall Dec. at 3, which suggests that it would not be possible for

7

the District to "obtain[] [this] desired information by other means," *Gavin*, 291 F.R.D. at 165. Thus, it appears that Dr. Hall's proposed psychological testing would "adduce specific facts relevant to the cause of action and necessary to the defendant's case." *Lester*, 2006 WL 3741949, at *1. Consequently, Defendants have made "an affirmative showing" that the specific examination sought by Dr. Hall "is really and genuinely in controversy and that good cause exists for ordering it." *Schlagenhauf*, 379 U.S. at 118. While there is a risk that additional testing will "exacerbate[e] [Plaintiff's] symptoms of trauma," the Court credits Defendants' assurances that Plaintiff will not be required—as part of the psychological testing—to "relive her trauma or discuss her alleged victimization" and that during that testing she "will not be discussing the underlying events at issue." *Id.* at 3 (internal citations omitted); *see also id.* at 7.

D.  <u>The Scope of Psychological Testing</u>

Having decided that Plaintiff is compelled to participate in psychological testing conducted by Dr. Hall, the Court next turns to the scope of that testing because it is required to "specify the time, place, manner, conditions, and scope of the examination." Fed. R. Civ. P. 35(a)(2)(B). As noted above, the District proposes that Dr. Hall will "administer the following tests to complement Dr. Kuo's examination and to evaluate Plaintiff's psychological status":

- Memory Validity Profile (MVP)
- Minnesota Multiphasic Personality Inventory-Adolescent (MMPI-A)
- Personality Assessment Inventory-Adolescent Version (PAI-A)
- Rorschach Performance Assessment System (R-PAS)

Reply at 2. The Court evaluates each test in turn.

Dr. Hall explains that "[v]alidity tests help establish the credibility of a respondent's test performance in order to increase confidence that obtained testing results offer an accurate estimate of the individual's functioning." Supp. Hall Dec. at 3. In the context of psychological assessments, they are "recommended by numerous professional organizations, including the National Academy of Neuropsychologists and the American Psychological Association." *Id.* More specifically, Dr. Hall notes that the "Memory Validity Profile (MVP, 2015) is a well normed, standardized validity test specifically designed to be administered to youth between the

8

1 ages of 5 to 21 years. . . . . It uses the paradigm of test items that appear to be related to memory,

2 but in fact are designed to assess patterns of chance or random responding." *Id.* It appears the

3 Defendants first specified Dr. Hall's intention to utilize this test in their Reply in Support of

4 Defendants' Motion to Compel. *See* Docket No. 126. The test is discussed further in Dr. Hall's

5 second Declaration in Support of Defendants' Motion to Compel. *See* Supp. Hall. Dec. at 3.

6 Plaintiff never discusses this particular test or lodges any specific objection to it, other than

7 Plaintiff's generalized objection to psychological testing. Given what Defendants allege the

8 benefits of the test to be—increased confidence in respondent's test performance and assessments

9 of patterns of chance or random responding—and the absence of any particularized objections

10 from Plaintiff, the Court **GRANTS** Defendants' Motion to Compel as it pertains to Dr. Hall's

11 utilization of the Memory Validity Profile (MVP).

12 Next, the Court turns to the proposed personality tests: the Minnesota Multiphasic

13 Personality Inventory-Adolescent (MMPI-A) and the Personality Assessment Inventory-

14 Adolescent Version (PAI-A). Dr. Hall explains that these two tests are "self-report tests . . . [that]

15 offer the individual the opportunity to describe herself or himself by either completing an

16 unfinished sentence, or by endorsing or rejecting a potentially self-descriptive sentence." Supp.

17 Hall Dec. at 2. The individual's responses are "compared with those of other groups of

18 individuals who have taken the test," which permits for the creation "a test 'profile' that can be

19 used to develop a description of each respondent." *Id.* The MMPI-A inventories (which were also

20 administered by Plaintiff's expert, Dr. Cecchet, during her forensic psychological evaluation of

21 Plaintiff) are "the most frequently employed, and most extensively researched empirically based

22 personality tests in the world." *Id.* at 4. "They are used in a wide variety of settings to assist in

23 the diagnosis of mental disorders. . . . [The inventory] contains 478 items, seven validity scales,

24 ten clinical scales, and a variety of supplementary and content scales that can be utilized to

25 provide a very sophisticated assessment of response style and degree of similarity to various

26 identified clinical groups." *Id.* The PAI-A "is a self-report questionnaire designed for youth

27 between the ages of 12 and 18, that provides information relevant to clinical diagnosis and

28 treatment planning." *Id.* at 3–4. It "consists of 264 items that are answered on a 4-point scale

9

(false, not at all true; somewhat true; mainly true; very true). The responses are then scored to provide 4 validity scales, 11 clinical scales, 5 treatment scales and 2 interpersonal scales," which "offer insight into the respondent's style in approaching the test. . . . [such as] the degree of consistency in responding, . . . the tendency to portray oneself in a particularly negative manner, as well as the tendency to portray oneself in a particularly positive manner." *Id.*

Defendants argue that it is necessary to conduct both of the personality tests and offer two points in support of that position. First, Dr. Hall asserts that "[t]he inclusion of multiple personality tests is designed to provide a multi-method assessment of Plaintiff, provided by the use of instruments that measure functioning using differing perspectives and methodologies. Reliance on a single personality measure considerably limits the validity of an assessment by restricting the range of information that is being gathered." Hall Dec. at 3. Second, Dr. Hall avers that the need is "particularly relevant in forensic cases, where a single test may be deemed invalid due to the manner in which it was completed by the examinee, and where re-testing is both impractical and seldom allowed." Supp. Hall Dec. at 2. Plaintiff argues that while "[m]ultimethod assessment is an essential component of both forensic and clinical psychological testing," such an approach would be "would be incorrectly utilized through the administration of multiple personality measures, as incremental validity is not a component of personality testing." Supp. Cecchet Dec. at 3–4. Dr. Cecchet further explains that the most common way to conduct a forensic assessment of a child is with a singular personality test. *Id.* at 3. She contends that conducting two tests, which may generate the same result, does not make that result "extra-clinically significant . . . [Thus,] conducting two personality tests would not provide any additional information [over conducting one personality test]." *Id.* at 4.

While courts often "defer to the expertise of the examiner and permit 'routine' examinations" to take place when the requirements of Rule 35 are fulfilled, *Ren v. Phoenix Satellite Television (US), Inc.*, 309 F.R.D. 34, 37 (D.D.C. 2015), courts are sometimes more directive in defining the scope of the medical examination(s) to be conducted, *see, e.g., Christopher v. Nestlerode*, No. 1:04-CV-0977, 2005 WL 8168354, at *1 (M.D. Pa. Jan. 3, 2005) (identifying the permissible line of questioning, the duration of the examination, and the type of

10

room in which the examination was to be conducted). Given the conflicting opinions of the medical experts in the instant case, the fact that Plaintiff's expert conducted only one personality test, as well as the need to be mindful of the burden of testing on the Plaintiff, the Court **ORDERS** that Defendants are permitted to conduct one personality test only. Which test is to be conducted may be determined by Defendants.

Defendants also seek to have Dr. Hall administer the Rorschach Inkblot Test, which entails showing the individual "a series of ten inkblots," Supp. Hall Dec. at 4, that are "designed to elicit characteristic responses to ambiguous stimuli," *id.* at 2. The individual's responses are then analyzed and compared to "a data set constructed from thousands of other responses." *Id.* at 4. Dr. Hall explains that the test "provides an opportunity to observe the ways in which an individual organizes and makes sense of fairly ambiguous, complex and emotionally provocative perceptual stimuli." *Id.*; *see also id.* at 2 (arguing the results "provide more or less disguised examples of the individual's characteristic perceptions, conflicts, concerns and problem-solving styles"). Dr. Hall further contends that one benefit to the Rorschach test is that "[i]t rarely is obvious what 'appropriate' responses might be to a projective test, which makes these tests harder to influence for either conscious or unconscious reasons." *Id.* Plaintiff's expert, Dr. Cecchet, contends that "[u]sing the Rorschach in a forensically focused assessment is not generally accepted as a standard of practice." Supp. Cecchet Dec. at 4. She further explains that it is rarely used, with research indicating that it is employed in less than 10% of cases. *Id.* Again, given the conflicting opinions of the medical experts in the instant case, the infrequency with which the Rorschach test is administered in the forensic content, as well as the need to be mindful of the burden of additional testing on the Plaintiff, the Court **DENIES** Defendants' motion as it pertains to the Rorschach Inkblot Test (Rorschach).

Finally, the parties disagree as to how much time Defendants should be permitted for testing. Defendants noted that when psychiatric evaluation and psychological testing are both conducted in a forensic context, "[t]he two procedures are usually split into separate days so that the plaintiff can have a break." Mot. at 7; *see also* Declaration of Dr. Kuo in Support of District's Request to Compel Examination ("Kuo Dec.") at 3–4; Docket No. 121 ("When psychological

11

testing is involved, typically there are multiple days of medical examinations, one day conducted by a psychiatrist and one day conducted by a separate psychologist."). As a result, Defendants request "psychological testing on a separate day from her psychiatric evaluation." Reply at 2. Defendants further argue that "[s]ubjecting a young plaintiff to a psychiatric examination and psychological testing on the same day is typically too exhausting." Mot. at 7; *see also id.* ("Given Plaintiff's age and alleged emotional distress, it would be unwise to overly tax her by demanding that she complete a psychiatric examination and psychological testing in a single day."). Plaintiff's expert has emphasized the importance of minimizing the burden on Plaintiff during testing, but does not specify whether one or two days of testing would be preferred if the Court also orders psychological testing. *See* Opp. at 3; *see also* Cecchet Dec. at 3 (noting that Dr. Cecchet "cannot agree that 'multiple days of medical examinations' by two experts is warranted or necessary").

Because many factors will influence the amount of time it takes to conduct the psychiatric evaluation and psychological tests, it is difficult to determine with precision whether it would be possible to conduct both evaluations on the same day. Dr. Hall has estimated that "Plaintiff's testing will take somewhere between four and six hours, depending on Plaintiff's ability to maintain good attention and focus, and if she is motivated to complete the assessment more rapidly." Reply ay 2. The parties do not appear to have provided an estimate for the amount of time that Dr. Kuo's evaluation will take; however, Dr. Cecchet did observe that Dr. Kuo's "psychiatric evaluation . . . would have been reasonably equivalent to the evaluation she underwent with her own expert," Opp. at 6, which took five hours, *id.* at 3, 6. The Court finds that the possibility of eleven total hours of testing and evaluation is likely to be too much for one day; as a result, the Court directs the parties to arrange for Dr. Kuo's psychiatric evaluation to be conducted on one day, and Dr. Hall's psychological testing to be conducted on a separate day. The examinations shall be scheduled to commence at a time and a date to be chosen by Defendants after consultation with counsel for Plaintiff. Any disputes regarding the timing of the examinations shall be brought before the Court.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the District's Motion to Compel as it pertains to the Memory Validity Profile and one personality test of Defendants' choosing. The Court **DENIES** the Motion to Compel as it pertains to a second personality test and the administration of a Rorschach test. The Court further **ORDERS** that the psychiatric evaluation to be conducted by Dr. Kuo and the psychological testing to be conducted by Dr. Hall be conducted on separate days.

This order disposes of Docket No. 119.

**IT IS SO ORDERED**.

Dated: September 18, 2019

_____
EDWARD M. CHEN
United States District Judge

13